The next case will be 081543, Secretary of Defense v. Raytheon Company. Mr. Byrd. Good morning, Your Honor, and may it please the Court. This Court should reverse the judgment of the Armed Services Board of Contract Appeals and remand this case back to the Board with instructions to determine the amount of interest that Raytheon owes the Government under the Cost Accounting Standards Clause, because Raytheon failed for more than four years to make the segment closing adjustment that the applicable Cost Accounting Standard requires. What is the premise of your position that interest is due? On what basis? The premise, Your Honor, is that Raytheon, under the Cost Accounting Standards Clause, as cited in our brief, Raytheon violated the Cost Accounting Standard, the particular Cost Accounting Standard. Is that under 413? Is that what you're saying? Yes, Your Honor. A violation of 413?  And what was that violation? The violation was that that regulation, or that standard, required Raytheon to make a segment closing adjustment in the year that the segment was closed. Well, they claimed they had no interest at that point. Exactly, Your Honor, and we think this is a case in which the Armed Services Board got it right the first time. In their initial decision, they found that Raytheon had violated that particular Cost Accounting Standard and owed the Government interest for its violation. On reconsideration, it departed from its prior decision and put a gloss or a limitation upon the Cost Accounting Standards Clause and the Cost Accounting Standards Act that is contrary to the text, and frustrates the clear and unmistakable purpose of those provisions, which is to provide the Government with full compensation, including interest, whenever a contractor violates a Cost Accounting Standard. What about the 30-day provision in the contract? The 30-day provision, Your Honor. Which prevails? Well, the Cost Accounting Standards Clause prevails because that is specifically agreed to and it furthers the Congressional purpose of providing full compensation. The Interest Clause, in its more recent version, which in the 1996 version, specifically accepts interest under the Cost Accounting Standards Clause from the outgrazing of the Interest Clause. Congress created a very carefully crafted regime here. It realized that in order to make the Cost Accounting Standards have teeth, it had to provide the Government with a remedy if the contractor violated. So what the Congress did is it provided for cast non-compliance interest to run from the date that the contractor violates or that the Government pays increased costs because of the violation to the date the Government has paid the full amount of the principal plus interest. And that's a different interest from the interest that's generally applicable under the Contract Disputes Act, which runs, of course, from the date that the Government asserts a claim and by means of a contracting officer's final decision. Assuming interest is due, the question is whether it's to be compounded daily. Now, 422 refers to 6621. The question is whether that's to be read in conjunction with 6622. 6622 says, in computing the amount of any interest required to be paid under this title, that's the Internal Revenue Code. This interest, if it's due, isn't required to be paid under the Internal Revenue Code. But then 6622 says, in any other amount determined by reference to such amount, and that such amount would suggest that it also refers to interest payable under the Internal Revenue Code. So why is 6622 part of this determination? The reason, Your Honor, is that Congress in 6622 was writing broadly and not limiting it to the Internal Revenue Code. But that's the language it used, under this title, or such amount? Well, it also refers to two provisions under Title 28. Which aren't applicable here. But the amount of interest determined by reference to such amount of interest, what is the amount of interest? The amount of interest would be an amount calculated under Section 6621 of this title. And 6621 was specifically incorporated into the Cost Accounting Standards Act in 1988, the technical name of which is the Office of Federal Procurement and Policy Amendments. And what we have here is in 1982, Congress made this change and said, whenever you calculate interest under Title 26, or make any calculation by reference to a calculation under Title 26, that's what the reference in the statutory language to any other amount of interest determined by reference to such amount of interest. By reference to such amount? It's such amount under Title 26, but that's what Congress said in 1988 in the Cost Accounting Standards Act. So you're asking for compound interest? Yes, Your Honor. The contracting officer didn't ask for it? That's correct, Your Honor. The contracting officer made every effort to try to resolve this claim and, in fact, was prepared to mitigate the amount of interest charged and ultimately, in his final decision, requested simple interest. But there's no impediment to you coming back and going for the whole follow action? Because the board correctly found in its initial decision that it had jurisdiction to consider the government's claim for compound interest made in the contracting officer's final decision. The reason being, although they did not cite it, but it would be this court's rationale in the Scott-Timber case, which we cite in our brief. Namely, it's the same claim because it's the same operative facts. Namely, Raytheon didn't pay the segment closing adjustment until more than four years after they were due. You have the same relief requested, namely interest, simply have differing legal theories on which the amount of interest is calculated. And the board correctly determined that it had jurisdiction and proceeded to decide that issue in its initial decision. What I'd like to focus on this morning is… What segments were the only segments that Raytheon owned and they sold them off and there would be no further payments to the government under separate contracts from Raytheon to the government and not subject to CAS? Would interest still be owed at that point? Oh, absolutely. Was there an oddity in the 413? The reason that interest would be owed is because when you sell your last segment, the last segment out, if you will, you have an obligation under CAS 413 to make a segment closing adjustment, whether it's your one of many segments or the last segment. And the way you make… Now, the CAS does specify that you have to do it in a different way if it's your last segment that you're selling. You can't, for example, agree to an amortization schedule because… The 15-year amortization schedule. Or any other period for the simple reason that the contractor doesn't have any more government contracts by assumption, hypothetically. So what you have to do is you have to make a current period adjustment and the CAS 413 is very clear about this. It has to be made in the year in which the segment was closed. In fact, we cite in our brief the language of the provision itself, the language of the CAS Board's promulgation comments in 1995 when it adopted this provision, and four separate illustrations that are in the language of the cost accounting standard 413 itself that make it clear that if you don't have an amortization schedule, you have to do it as a credit. You have to make it as a credit. Isn't there some implication in the Allegheny case that that's not necessarily correct? That if there's no continuing relationship with the government at that point, that the payment need not be made? I don't believe Allegheny Teledyne said that. It did address the question of whether the cost accounting standard 413 adjustment was a current period adjustment or a prior period adjustment, and they said it had to be a current period adjustment. This court was quite clear. But the current period adjustment would be as of today, subsequent years. The way the court framed it and the way the accountants talk about this, Your Honor, a current period adjustment means in this case, in this context, the period in which the segment was closed. So if this was your last segment, what you would have to do is you would have to make the adjustment by means of a credit. And anyone who's ever paid a phone bill or a credit card bill knows what a credit is. A credit means it's a reduction in what you have to pay. And that's what Raytheon was required to do, reduce the amount the government had to pay either by reducing a contract price or reducing costs. That's assuming that there's a continuing relationship. No, Your Honor. Even if the contract, if the segment is sold, the contract would still have to be closed for the contracts that were being performed by the segment at the time it was closed. There would still be an opportunity to correct that. And the contractor does not get a free ride if it sells the last segment. And sells the pension plans along with it. And transfers the pension plans along with it. At that point, then, wouldn't the recovery not be available? And if I sell the total segment along with the pension plans, the defined benefit plan is transferred along with the segment, and they assume the new liability, there would be no payment over at that point. That would be true, Your Honor, but for a different reason. And the reason is that the CAS Board, in its wisdom, addressed that situation and provided that if you sell a segment and you transfer all of the pension assets and liabilities allocable to the segment to the buyer, then you do not have to make a segment closing adjustment at all. Because it would not be closed. The pension plan would not be closed because here you're treating it as if the pension plan was terminated in order to get the credit out. It applies in either event. Whether the pension plan is closed, and the language of the CAS is very clear, that you have to make a segment closing adjustment whether or not the pension plan is closed as part of the transaction. The obligation arises because you are closing the segment. And frequently a pension plan will stay in existence. Sometimes assets and liabilities from the plan are transferred to a transferee plan with the buyer. But in any and all events, you have to make the segment closing adjustment. Your Honor, I thank you. Where's the rest of my time? Thank you. Ms. Manos. Your Honor, may it please the Court, I'm Karen Manos from the law firm Gibson, Dun & Crutcher on behalf of the Appellee Raytheon Company. Your Honor, this Court should affirm the ASPCA's decision on reconsideration for two principal reasons. First, the government failed to prove that the United States paid increased costs as a result of the alleged CAS noncompliance. And second, the government failed to prove that there was a CAS noncompliance. In addition, this Court should correct... Well, on the second point, they didn't make the adjustment in the appropriate year. So isn't that clear that there was a failure of compliance? No, Your Honor. CAS 413 doesn't specifically say when you have to make the adjustment. It's an accounting adjustment. It says it has to be made as of the date of the sale of the segment. And the adjustment was made as of that date. This Court addressed a similar issue, and I believe Judge Gardaschus' questions was going in this direction. It has to do with the contract mix. Do you look back at the prior years or do you use the contract mix in the current period? That's exactly what Allegheny Teledyne addressed. This Court addressed a similar issue under a different provision in the Hercules case, having to do with the refund of state income taxes. But the critical issue, if I may, going to the first point in Judge Gardaschus' questions, hit exactly the issue, and that's the issue in this case, and that is that the government's argument is confusing the segment closing adjustment with the price adjustment for increased costs paid. The parties here agree on what the law is. That is, the government bears the burden of proving two things, that there was a cast noncompliance and that that noncompliance resulted in increased costs paid. The segment closing adjustment is not a price adjustment for a cast noncompliance. With a defined benefit pension plan, the pension contributions are made based on long-term actuarial adjustments. They may be too high. They may be too low. They're generally corrected over the years, and they're amortized out 15 or 30 years on a rolling basis. Don't the adjustments have to be made as of the date of the plant closure? Your Honor, the adjustment has to be made as of that date. Cast 413 contemplates two things. When the segment is sold, there's going to be a final settling up. There may have been too many costs charged. There may have been too little. That's not a cast noncompliance. The contemplation is the parties are going to do one of two things, either agree on the method for making the adjustment or one party is going to submit a claim against the other one. Contractors submit claims. If there's a pension deficit, the government submits a claim. The contractor can't unilaterally adjust the price of any of its contracts. And here the facts are that the government demanded that Raytheon make a payment by check paid to U.S. Treasury. The government's wrong in calling that the principal amount. That's the segment closing amount. If that segment closing, if there wasn't that cast noncompliance that resulted in increased costs paid, what the statute says and what the cast clause says is that interest runs from the payment at increased cost. The government below never presented any evidence, and there is no such evidence, that any of Raytheon's contracts were ever charged anything more as a result of not making the payment. What they're complaining about is Raytheon's failure to pay the money on time, so the time value of money. But the statute is much more specific than that. It says increased costs paid. There has to be some payment there. There was no payment. Is that really referring back to the payments that were made to the pension plans when the pension plans were still part of Raytheon? Your Honor, that's exactly the point. That particular segment? Your Honor, that's exactly the point. And that's the error the ASVCA made initially, where they were confused. The segment closing is not a noncompliance. All those years when the actuarial assumptions were being made, there's absolutely no allegation that there was anything improper about it. That's not the noncompliance. The noncompliance would be, for example, if they had failed to make the segment closing adjustment, and then as a result their pension costs were higher in that year. But as a matter of fact, there were no pension costs. Because there was a surplus, there were absolutely no pension costs. Well, isn't that what happened up until, let's say, the last year? That there was perhaps over – well, there was a favorable actuarial experience. And wasn't the contract then bid higher, such that the government ended up paying more than experience showed was necessary? Your Honor, let's assume that that's true. That's not a cast noncompliance. The cast noncompliance that's alleged here is Raytheon's failure to submit the check on time. And it wasn't that Raytheon was sitting on the money. Well, aren't there two things? One is the failure to make the adjustment on time, and then secondly, the available to make the payment on time. No, Your Honor, absolutely not. The failure to make the adjustment on time is what they're complaining about, and that's submitting a check. Raytheon, a contractor under a government contract, cannot unilaterally change the contract. That right is reserved to the government. So Raytheon had to wait until the government agreed with its computation of the amount. And because the Teledyne case was in litigation and this court hadn't yet – it hadn't gotten to this court, the government's share was in hot dispute. And so we really couldn't determine. Contractors with deficits couldn't determine. They were with a surplus, couldn't determine what the government's share was. Once that was resolved and the government agreed with Raytheon's computation, Raytheon made the adjustment within 30 days. So interest never began to run under the interest laws. Well, if there is interest, is it accrued daily? Your Honor, no. And there are a couple of different reasons for that. The plain language of the Cass statute and the Cass clause – actually, what we're interpreting here is a Cass clause, not the statute, although the clause interprets the statute – refers back to the annual rate of interest established under 6621. It doesn't mention 6622 at all. In a very similar case in the Eleventh Circuit, which we cite in our brief, the Carrier's Container Council, they point out that when it refers to the rate, they're not incorporating other things like the computation. Except it's the adjacent statute. It would make sense that they be read together. Your Honor, perhaps. But the facts here are even more compelling than they were in Carrier's Container because the statute in that case referred to the rate. The Cass statute actually refers to the annual rate. If you're going to do it compounded daily, annual rate is really superfluous. You don't need the word annual. You would just refer to the rate. Secondly, the fact that— Well, the annual rate, if it's 3.65 percent, you divide it by 365 days, and then whether you approve it daily or not is a separate issue. Your Honor, I would disagree with that. But respectfully, the second point is that it doesn't— If you go to 6622, it refers to the rate established under this title, meaning Title 26. And it also refers to interest under two other specific statutes. If the government's right that whenever— And those two statutes, if you go back and read them, also refer to the rate established under 6621. If the government's right that every time you refer to something established under 6621 that it automatically means it's compounded daily under 6622, there would have been absolutely no reason in the world for Congress to stick in those other two statutes. They're completely superfluous. I notice you're not arguing the points that I relied on when I questioned your opposing counsel. That 6622 could be interpreted to mean basically a tax—interest on taxes. Your Honor, I agree with that. That's exactly what it is. I didn't hear you say that. Your Honor, when it refers back to this title— It tends to suggest that what I—my question wasn't soundly based. No, Your Honor, I think your question was exactly the right question. That is, this title means Title 26. But here it's a contract clause we're interpreting. And what the Supreme Court and what this Court has held is that when the government enters into contracts, its rights are generally governed by the law of contracts, except when there's something special about it being sovereign. The contract clause here refers to the rate established by 6621. It doesn't incorporate anything else. So under the plain language of that contract clause, you wouldn't call in the computation method under 6622. Was there ever a determination made by the Board as to whether or not Raytheon was in compliance with CAS? Your Honor, in the initial decision, there was. The ASBCA decided that no matter whose fault it was that it took four years to resolve what the government share was, that the CAS requires that the adjustment actually be made in the year of the segment closing. On reconsideration, though, the ASBCA divided that into two pieces. It said, as a matter of law, CAS 413 requires that the adjustment be made as of the date of the segment closing. But as a matter of fact, the record is— Doesn't that really imply that it is of the date of the segment closing? Does it mean that the present value of money would be taken into account by an interest rate? Because if I'm entitled to receive $1,000 in 1998 and I don't receive it until 2004, that $1,000 present value is not $1,000 anymore, but $1,000 plus an interest rate. Your Honor, the government's claim here was not submitted under CAS 413. CAS 413 does not include interest. The segment closing adjustment is not principled. The government's claim here was asserted under the CAS clause, which only applies when there's been increased cost paid as a result of the noncompliance. So you have—there's a two-step analysis here. You have to first find that there's noncompliance. Then you have to find that that noncompliance actually resulted in payments, increased costs paid under a government contract. There's absolutely no evidence that the government ever paid one penny more as a result of Raytheon's failure to submit these checks on time. You actually have to find a payment on a CAS-covered contract. And that's the error that the ASPCA recognized. They made that mistake in the first decision by conflating these two things, by confusing the segment closing adjustment with the price adjustment for increased cost paid. The whole point of the reconsideration decision is to separate those out, to recognize that the segment closing adjustment is not a price adjustment. That's not the increased cost paid. The statute and the regulations all require that you do a contract-by-contract impact analysis to see whether that noncompliance actually resulted in payments of increased cost paid. If there were any payments of increased cost paid, interest runs from the date of payment until the money is paid back. But there was never any showing at all, and there is no showing because there was a surplus. No pension costs were charged, either in the year of the sale or any future year. It was done. The segment closing was done. All that happened was Raytheon paid the money. So the imputed value of money, although the government makes that argument, is not what the claim was. The claim was under the CAS clause. It's like Chief Justice Cardozo and the Long Island Railway case. Negligence in the air is not enough. Imputed interest is not enough. The claim here was asserted under the CAS clause, and it requires a showing of increased cost paid on a specific contract, and there was no such showing. And it's too late for the government to come in and make another argument that, well, we could have adjusted the price of this, or to say it's like a credit card, that credit means you have to give the money back. That's not what happened here at all. If you look at the record, the government was very specific about how they wanted the segment closing adjustment made. They wanted Raytheon to write a check made payable to the U.S. Treasury. That's exactly what happened. As a result of that, there were never any increased cost paid. Now, the transaction when the segment was sold, the pension plan was not transferred, was it? That's correct, Your Honor. Raytheon retained all the assets and the liabilities. In fact, there were about, if you look at the record, there were about ten sales of segments. Some had pension deficits. Some had, and what the parties, and the record shows this, what the parties contemplated was that they were just going to, and if you look at page A549 in the record, they were going to just figure out what the government's share was of all these deficits and all these surpluses. And at the end of the day, there would be one check. Either the government would write Raytheon a check, or Raytheon would write the government a check. After this court's decision in Allegheny-Tellegein, the government had a change of heart about the deficits. It's refused to pay any of the deficits, but it still wanted the contractors to pay for the surpluses. And the way they wanted the payment made, if you look at the record, was write a check to the treasury. And so what happened was Raytheon now has four pending claims in the Court of Federal Claims for the deficits the government refused to pay for the surpluses. It paid the segment closing adjustment just like the government wanted, and then the government asks for interest. Are you asking for daily compounded interest in the claims? Your Honor, we're not, because that's not what the Caste Clause provides, and we're trying to at least be consistent, and yes, Your Honor. But you did retain the pension plan completely, because I presumed there was one pension plan for Raytheon that was allocable to each one of the subsidiaries or whatever you have. Your Honor, there are a couple, but you're right. There's basically the big non-bargaining plan, there's a bargaining plan, and basically it's on a segment-by-segment basis accounted for under government contracting. But the assets are commingled for investment purposes. Yes, Your Honor, that's right. But here, because there was a surplus, there were no costs charged, and once that segment is closed, you can't keep continuing to charge pension costs. The settling up is a snapshot in time, and so there are no increased costs. There are never any more pension costs for that segment ever being charged to any other government contracts. And absent that payment of increased costs, there's no triggering event. And that's exactly what the ASBCA recognized correctly in the reconsideration decision. It separated out those two things that the government is trying so hard to push together. It recognized that the segment-closing adjustment is not a noncompliance. There's never any allegation that Raytheon made a mistake in the prior years. And as a result of even if there were a noncompliance, there were never any increased costs paid. And absent that triggering event, there's no interest due. And that's exactly what the ASBCA explained correctly in this reconsideration decision. Now, in your brief at page 29, you made a statement which we're still trying to figure out what the impact is. You said that allocating the cost to a period and paying the cost in that period are not the same. Now, the allocation would be made, for instance, in 1999 or 1998, and the payment would be made in 1999. Is that a difference in payment to the plan? Is that what you're referring to? Your Honor, it's not really a difference in payment to the plan so much as the contract mix issue that you addressed, that this Court addressed in the Allegheny-Teledyne case. Okay. What year is the contract mix? When the contract was made. Yes, Your Honor. Thank you, Your Honor. Thank you, Your Honor. I would like to make three points in my rebuttal. First, this is clearly not a case of a failure of proof. That wasn't what the Board, the basis upon which the Board decided the case. And if the Court will refer to the Board's decision in page 826 of the record, it will be clear. There is an extensive discussion that suggests that there is a failure of proof. Suggests that a CAS 413 violation can never be a triggering event for an entitlement of interest under the CAS clause. And moreover... Which is a question of law that you think is wrong. Yes, Your Honor. We think that's squarely wrong and squarely contrary to the text of the statute. Second point. This is clearly a case of a violation and clearly a case of increased cost. The violation is that they failed to make the credit, apply the credit in the year of segment closing. And there can be no doubt. We all know when we've gotten a credit. And the government's position on that proof of increased cost is, to borrow from the world of negligence law, If the CAS requires the contractor to apply a credit and reduce the cost of one contract, or more than one contract but less than all, or all contracts, which is what the CAS provides, and the contractor does nothing, which is what Raytheon did, then plainly the government has paid increased cost. It's not our burden to... When is the government supposed to get its money back? The plant closes, say, March 31st. Your Honor, the way that would work is it would be a credit applied against the amount of cost for that year or the contract price for that year. So whenever the government pays the amount of the contract price or an installment of a contract price or a cost allowance, that's how the government gets paid. Was there a determination that Raytheon was in compliance with CAS ever made? No, Your Honor, the exact opposite. The board determined that originally they were in noncompliance with CAS, and then... Then they changed their mind. Then they changed their mind. And the basis for the government's claim is that they failed to apply the credit when they should have. I know your time is about up with the occurrence of the presiding judge. Could you mention your third point briefly? Yes, Your Honor. The third point was that I apologize to you because I didn't bring this up previously. With respect to Your Honor's statutory interpretation argument, the reference to what such amount means in Section 6622, this court in the Canadian Fur Trappers Corporation case specifically addressed that issue and applied Section 6622 to the computation of interest under the Trade and Tariff Act of 1984 in a decision by Judge Michel, which is directly analogous. We put in our brief how... A decision by court whose opinion was written by Chief Judge Michel. That's correct, Your Honor. Much more aptly phrased. Thank you, Your Honor. Thank you. The case is submitted.